**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

PAUL H.,

      Plaintiff,

v.                                                    CIVIL ACTION NO. 2:24-cv-511

FRANK BISIGNANO,
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Paul H. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 2). By standing order entered on January 4, 2016, and filed in this case on September 19, 2024, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's Motion for Judgment on the Pleadings (ECF Nos. 6, 7) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 10).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 6, 7), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 43 years old at the time of his alleged disability onset date and 45 years old on the date of the decision by the Administrative Law Judge ("ALJ").  (*See* Tr. at 14, 17, 189).[1]  Claimant completed through the ninth grade of high school.  (Tr. 70). Most recently, Claimant worked as an auto mechanic, and he has also been employed as a tree trimmer, as well as in the following positions in the coal-mining industry: roof bolter, general miner, rock truck driver, and shuttle car operator.  (Tr. 27, 69, 79, 209, 220, 229-236). Claimant alleges that he became disabled on December 26, 2019, due to the following impairments: (1) recurrent anal fistulas, (2) bilateral carpal tunnel syndrome, (3) "heart problems," (4) hyperlipidemia, (5) type II diabetes mellitus with peripheral neuropathy, (6) hypertension, (7) obstructive sleep apnea, and (8) gastroesophageal reflux disease ("GERD").  (Tr. 17, 19-22, 189, 196, 208, 879-880). Claimant also alleges that he suffers from the following additional conditions that further impair his ability to maintain stable gainful employment: (1) obesity, right foot nerve disorder, (3) emphysema, (4) anxiety, (5) depression, (6) hemorrhoids, (7) restless leg syndrome, (8) lumbar degenerative disc disease, (9) chronic low back pain, (10) bulging discs L4-5 with lateral recess stenosis, (11) focal right paracentral disc extrusion L5-S1, (12) osteoarthritis of the left knee, and (13) fatty liver. (ECF No. 6 at 15).

Claimant filed his application for benefits on August 17, 2021.  (Tr. 17, 29, 63-64, 71-72, 196).  His claim was initially denied on January 21, 2022, and again upon

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 5.

reconsideration on December 20, 2022.  (Tr. 63-85).  Thereafter, on January 3, 2023, Claimant filed a written request for hearing.  (Tr. 97-98).  An administrative hearing was held before an Administrative Law Judge ("ALJ") on September 14, 2023.  (Tr. 17, 35-62).  On October 31, 2023, the ALJ rendered an unfavorable decision.  (Tr. 14-29).  Claimant then sought review of the ALJ's decision by the Appeals Council on November 3, 2023.  (Tr. 7-13).  The Appeals Council denied Claimant's request for review on July 22, 2024, and the ALJ's decision became the final decision of the Commissioner on that date.  (Tr. 1-6).

Claimant timely brought the present action on September 19, 2024, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2).  The Commissioner filed a transcript of the administrative proceedings on November 7, 2024.  (ECF No. 5).  Claimant subsequently filed his Motion for Judgment on the Pleadings and Brief in Support (ECF Nos. 6, 7), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 10).  As such, this matter is fully briefed and ready for resolution.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the relevant medical evidence, and summarizes the relevant portions here for the convenience of the United States District Judge.

### i.    Treatment Records

**<u>Chest pain/sleep apnea</u>**: On September 16, 2020, Claimant presented to Rachel Baisden, FNP, at Three Rivers Medical Clinic ("TRMC"), following up on complaints of chest pain after a visit to the Emergency Department the week prior. (Tr. 429). At the hospital, Claimant was admitted and administered a stress test, which showed no issues.

(Tr. 430). As of the date of the visit with Ms. Baisden, Claimant reported that his pain had subsided. (*Id.*). However, he reported experiencing "chest pain on exertion (occ if he gets aggravated), shortness of breath when walking (up a hil occ) [sic], and light-headed[ness] on standing." (*Id.*). Ms. Baisden referred Claimant to a cardiologist. (*Id.*).

On November 3, 2020, Claimant presented to Melissa Lester, D.O., at Marshall Cardiology, again complaining of chest pain. (Tr. 637-638). At this visit, Claimant reported that he experienced shortness of breath at rest, though Dr. Lester noted Claimant experienced "[n]o increased work of breathing or signs of respiratory distress" upon examination. (*Id.*). On December 15, 2020, Claimant followed up with Dr. Lester via telehealth. (Tr. 356-358, 432-435). Claimant reported that he woke up struggling to catch his breath. (*Id.*). Dr. Lester ordered a sleep study, which was completed at Claimant's home on August 23, 2021, and indicated Claimant had moderately severe sleep apnea syndrome. (Tr. 320-327).

On July 24, 2021, Claimant presented to Richard Sexton, M.D., at the Cabell Huntington Hospital ("CHH") Emergency Department, complaining of chest pressure, high blood pressure, and vomiting, which began while he was working on his car. (Tr. 517-521). Claimant reported no shortness of breath at this visit. (*Id.*). He was discharged without a diagnosis and instructed to follow up with a stress test, which he already had scheduled and which occurred on September 7, 2021, at Logan Regional Medical. (Tr. 398-399, 517-521). The results of that test were within normal range. (Tr. 659, 788).

On January 18, 2022, Claimant received a CT scan of his chest, which showed a "small left apical pulmonary nodule and small focus of pleural thickening within the posterior aspect of the upper left lobe." (Tr. 493-494). On February 9, 2022, Claimant presented to Mohammed Aljasmi, M.D., at Marshall Internal Medicine Pulmonary

4

("IMP"), complaining of obstructive sleep apnea, emphysema, and the nodule seen in the January scan. (Tr. 641-643). Dr. Aljasmi noted Claimant experienced "normal work of breathing" and that "very minimal emphysema" was visible on imaging. (*Id.*). At an appointment with Ms. Baisden on March 21, 2022, Claimant reported no chest pain or shortness of breath. (Tr. 588-593). On May 10, 2022, Claimant presented to CHH Center for Lung Health for pulmonary function studies, at which he was diagnosed with "dyspnea on exertion." (Tr. 476-483).

On June 23, 2022, Claimant presented to TRMC for a follow-up visit, where he reported occasional shortness of breath but indicated he was doing well with his CPAP machine and "[felt] rested in the mornings." (Tr. 604-609). On June 28, 2022, Claimant again presented to  Marshall IMP regarding obstructive sleep apnea and shortness of breath, where he reported that he had ceased smoking. (Tr. 650-652). He had a CR scan of his chest at CHH that same day, which showed "underinflated lungs with mild basilar bronchovascular crowding." (Tr. 475). On July 15, 2022, Claimant presented to CHH for a CT scan of his chest, which revealed "[n]o focal noncalcified lung nodule or mass" or "pleural effusion or pneumothorax." (Tr. 472-473). However, provider notes indicate "T6-7 disc osteophyte complex causing canal stenosis." (*Id.*). A follow-up CT scan on December 29, 2022, showed "[i]mproved mediastinal and hilar adenopathy" and a "[s]uspect fatty liver." (Tr. 678, 815).

On January 17, 2023, Claimant presented to April Holley, APRN-FNP-BC, at Marshall Cardiology, for a follow-up consult regarding his chest pain. (Tr. 659-661). He reported he had been experiencing escalating chest pain and pressure for approximately one month, as well as worsening dyspnea with exertion. (*Id.*). He also indicated at this appointment that he had, again, been smoking approximately one pack of cigarettes per

day. (*Id.*). On February 8, 2023, Claimant presented to Emily Kennedy, APRN-NP, at Marshall Cardiology, for a follow up on his chest pain. (Tr. 656-658). He complained that he was experiencing chest pressure daily. (*Id.*). Provider notes from a February 13, 2023, check-up indicate that Claimant had been having occasional chest pain but was not experiencing pain in his chest on that day. (Tr. 847).

On February 28, 2023, Claimant presented to Marshall IMP for obstructive sleep apnea and emphysema. (Tr. 689-91). Provider notes indicate "[q]uestionable reactive airway disease component of symptoms in the setting of active tobacco use." (*Id.*). At this visit, the provider changed certain settings on Claimant's CPAP machine to increase its efficacy. (*Id.*). On April 18, 2023, Claimant again presented to Marshall IMP regarding his sleep apnea. (Tr. 692-694). Provider notes indicate that, prior to this visit, Claimant had his CPAP machine taken away for noncompliance. (*Id.*). However, Claimant reported that the CPAP setting changes made on February 28th had been beneficial and he "[felt] much better on the days that he use[d] it." (Tr. 694). The provider ordered an additional sleep study be performed so that Claimant could requalify for a new CPAP machine. (*Id.*). On May 4, 2023, Claimant presented to CHH Sleep Center for a sleep study. (Tr. 695). The results of his sleep study indicated that Claimant's sleep apnea was severe and that Claimant also experienced oxygen desaturation during the study. (Tr. 696-697).

**Fistulas**: On October 9, 2020, Claimant presented to Jeremy Klein, M.D., at TRMC, for incision and drainage of a perineal abscess. (Tr. 898-899). He reported healing well from that surgery at a follow-up visit on October 23, 2020. (Tr. 900-902). However, at another follow-up visit on November 6, 2020, Claimant's wife indicated that Claimant's wound had "yellow mucus discharge," and a culture "showed Klebsiella and enterococcus." (Tr. 903-905). Claimant was placed on a round of antibiotics and

instructed to shower daily. (Tr. 904). Two weeks later, on November 14, 2020, Claimant complained of "a new swelling above the open wound" starting five days prior. (Tr. 906-908). By November 30, 2020, however, "the new lesion [had] decreased and nearly resolved." (Tr. 910). An additional lesion appeared on Claimant's right groin in December 2020, but according to Claimant's wife, that lesion "drained spontaneously" without medical intervention. (Tr. 912).

On February 22, 2021, Claimant presented to CHH's Gastroenterology Clinic complaining of blood in his stool. (Tr. 502-504). Provider notes from the February 2021 visit indicate that Claimant "[w]as seen by surgery at [the] beginning of February 2021 for evaluation for recurrent perineal abscess and fistul[as] and at that time there was only evidence of scar tissue[,] no active wound." (*Id.*). A colonoscopy performed on March 2, 2021, showed evidence of hemorrhoids but "no fistula tract [was] seen" in his rectum. (Tr. 505-506). An MRI of Claimant's pelvis on April 29, 2021, showed "no perianal fistula or abscess." (Tr. 654).

On May 17, 2021, Claimant presented to Paul Bown, M.D., at CHH's Surgery Clinic, complaining of rectal bleeding with "[n]o actual or suspected pain." (Tr. 510). On May 27, 2021, Claimant underwent surgical treatment of a "superficial" anal fistula "on the left posterior buttock tracking directly to the rectum." (Tr. 512-513). A CT enterography performed on July 1, 2021, showed "[n]o perirectal abscess." (Tr. 654). On July 20, 2021, Claimant presented to Douglas Henson, M.D., at CHH's Surgery Clinic, complaining of "a perineal lesion that [had] begun to drain . . . bloody/purulent fluid." (Tr. 529). On examination, Dr. Henson noted "a 1 cm open ulcerated appearing area to the left of midline in the low perineum." (*Id.*). On August 16, 2021, Claimant underwent a "partial

fistulotomy with Seton placement" and "[i]ncision and drainage of left gluteal cyst x3." (Tr. 531). An additional anal fistulotomy took place on September 27, 2021. (Tr. 497).

On February 14, 2022, Claimant underwent surgical debridement of a nonhealing anal fistulotomy wound and excision of a 1.5 cm anal cyst. (Tr. 486). At a post-operative check-up, Dr. Henson noted that Claimant's wounds were healing well. (Tr. 644).

The next treatment record related to Claimant's suspected anal fistulas is dated February 6, 2023, when Claimant presented to Dr. Bown at Marshall Surgery complaining of a sebaceous cyst on "an area anterior to the anus." (Tr. 662). Upon physical exam, Dr. Bown noted "[t]here appear[ed] to be a small sinus tract on the anterior of the right perineum consistent with an anal fistula opening." (*Id.*). However, when Dr. Bown operated on the area on March 16, 2023, he noted "a small area of folliculitis anterior to the anus near the tail of the scrotum" but found "no evidence of an anal fistula at [that] time." (Tr. 664-665). Provider notes from Claimant's post-operative follow-up visit on March 31, 2023, confirm "no tunneling or evidence of recurrent anal fistula." (Tr. 675).

On May 12, 2023, Claimant again followed up with Dr. Bown. (Tr. 782). At that time, the previous surgical wound had completely healed, but Claimant expressed concern about "[two] new areas on his perineum," which Dr. Bown felt "appear[ed] to be mild areas of folliculitis." (*Id.*). Later that same month, Dr. Bown noted that Claimant had "recurrent folliculitis with possibly a small sebaceous cyst," which he excised in office that same day. (Tr. 780). He further noted "no tracking or evidence of a fistula." (*Id.*). The wound from the excision had healed as of June 2, 2023. (Tr. 778).

On July 24, 2023, Claimant presented to Dr. Bown, again complaining of two areas of folliculitis. (Tr. 775). However, upon examination, Dr. Bown saw "no area of infection"

and surmised that Claimant was "getting occasional folliculitis," for which he referred Claimant to a dermatologist. (*Id.*).

**Back Pain**: On June 7, 2022, Claimant presented to TRMC, complaining of back pain "with bending and twisting at the waist." (Tr. 599-603). Provider notes from a follow-up visit on June 23, 2022, indicate that Claimant complained of having "low back pain" since the last visit with the provider, which he described as an "aching pain." (Tr. 604-609). The provider referred Claimant for physical therapy to treat his back pain. (*Id.*). On June 28, 2022, Claimant received a CR scan of his spine at CHH, which showed "mild degenerative changes" in his "lower lumbar spine." (Tr. 474). At a follow-up visit at TRMC on August 16, 2022, the provider again referred Claimant for physical therapy. (Tr. 610-614).

On October 11, 2022, Claimant again presented to TRMC to follow up on his back pain. (Tr. 615-620). Claimant reported that his pain had increased to a 6/10 rating that became worse if he sat or stood. (*Id.*). Claimant also reported that the pain was affecting his right leg. (*Id.*). On November 14, 2022, Claimant had an additional follow-up visit at TRMC regarding his back pain, and he again reported that his pain "worsen[ed] with extended periods of sitting and standing." (Tr. 621-626).

On May 2, 2023, Claimant presented to Torin Walters, M.D., at CHH, for an MRI of his low back. (Tr. 666-669). That scan showed "large concentric disc bulges and remarkable facet arthropathy particularly on the left" with stenosis. (*Id.*). On August 14, 2023, Claimant presented to Onyechi Megafu, M.D., at St. Mary's Pain Relief Specialists. (Tr. 834-837). Dr. Megafu recommended that Claimant receive a transforaminal epidural steroid injunction at the left L4-L5 levels and right L5-S1 levels. (*Id.*).

**Depression/anxiety**: Claimant's medical records related to his anxiety and depression are inconsistent. For instance, provider notes from a September 16, 2020, visit with Ms. Baisden indicate Claimant denied experiencing depression, anxiety, or sleep disturbances. (Tr. 430). Claimant again reported no anxiety or depression on July 20, 2021. (Tr. 529). However, on March 21, 2022, Claimant presented to Ms. Baisden and said that his wife "[thought] that he [was] having some anxiety and depression issues." (Tr. 588-593). He reported feeling stressed "to some extent." (*Id.*). On June 23, 2022, Claimant had a follow-up visit at TRMC regarding several issues, including his depression and anxiety. (Tr. 604-609).

The following month, Claimant again denied depression, agitation or anxiety. (Tr. 653-655). On November 14, 2022, Claimant reported a depressed mood. (Tr. 621-626). Two months later, on January 17, 2023, Claimant denied anxiety, depression, and poor concentration. (Tr. 659-660). He again denied the same on April 19, 2023. (Tr. 670, 804).

Provider notes from May 31, 2023, indicate that Claimant was then on Zoloft for his anxiety and depression but that Claimant expressed concerns about its continued efficacy, noting that "he [was] getting anxious and overwhelmed again[,] . . . [did] not focus well[, and] . . . [got] irritated easily." (Tr. 870). A depression screening from August 14, 2023, resulted in a score of zero based on Claimant's responses denying depression and anxiety. (Tr. 834-835).

**Diabetes**: On November 15, 2018, Claimant presented to Ms. Baisden at TRMC, reporting a suspicion that he had diabetes. (Tr. 539-541). However, on February 22, 2021, Claimant reported no history of diabetes. (Tr. 502). By the following year, diabetes was listed as an ongoing problem. (Tr. 641). Although there are no medical records indicating precisely when Claimant was diagnosed with diabetes, the ALJ found that "[a]t least as of

December 2021, [Claimant's] diagnoses included diabetes mellitus." (Tr. 20). Records from Marshall IMP dated February 9, 2022, indicate that diabetes was listed among Claimant's ongoing problems. (Tr. 644).

On June 23, 2022, Claimant presented to TRMC and admitted that he was "not checking his [blood sugar] daily." (Tr. 604-609). On January 17, 2023, Claimant informed providers at Marshall Cardiology that he was "[u]nsure of" his A1C levels. (Tr. 788). Provider notes from February and May 2023 indicate that Claimant later began monitoring his blood glucose levels. (Tr. 831, 847, 870). Provider notes from May 24, 2023, indicate that Claimant had recently begun a new diabetes medication. (Tr. 831). No other problems related to Claimant's diabetes are evident in the medical records provided to the Court.

### ii.    Claimant's Hearing Testimony

At the September 14, 2023, hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 35-62). Claimant testified that he then suffered from carpal tunnel syndrome, breathing problems, a fistula, low-back pain, depression, and anxiety. (*Id.* at 46). As to carpal tunnel syndrome, Claimant testified that the condition had existed in both hands since approximately 2019 and caused numbness up to his elbows, as well as loss of control and weakness. (*Id.* at 46-47). Although he had surgery on his left hand, Claimant testified that he felt surgery had not been beneficial and elected not to pursue surgical intervention as to his right hand. (*Id.* at 55-56).

Claimant testified that he believes his low-back pain—which he described as a "real sharp, dull pain" extending down both legs to his feet—is due to a herniated or protruding disc at L5/S1. (*Id.* at 47-48). He further testified that the pain had affected his ability to walk or stand, causing him to stumble or fall, and also negatively impacted his ability to

sleep and concentrate, resulting in irritability and forgetfulness. (*Id.* at 48-49). According to Claimant, he could walk approximately 15-20 steps on a "bad" day and around one city block on a "good" day. (*Id.* at 49). He could not recall whether he had been diagnosed with osteoarthritis in his back. (*Id.* at 53).

With regard to his anal fistula, Claimant testified that the condition had existed since 2019 and caused constant pain or discomfort, especially when sitting or walking, and affected his ability to sleep. (*Id.* at 49-50). He described the pain as "a real sharp pain, like it's got a lot of pressure on it . . . like needles poking in you." (*Id.* at 50). Claimant further testified that it bled "[a]bout every other day" and that the friction from walking exacerbated the issue. (*Id.*). He testified that he had some fistulas removed, though he could not recall the number and stated that they kept "coming back." (*Id.* at 51). As of the ALJ hearing date, Claimant estimated that he then had "probably two" active fistulas. (*Id.*).

Claimant then testified that he had experienced both depression and anxiety for approximately two years. (*Id.* at 51). He further testified that both conditions had affected his ability to sleep, stating that it was "hard for [him] to go to sleep" because "little stuff bother[ed] [him] so much." (*Id.* at 52). According to Claimant, the depression also increased his appetite, negatively impacted his desire to be around people, and resulted in a decreased desire to participate in things that interested him. (*Id.* at 51-52). Claimant testified that he was taking medication for his depression and had no side effects from said medication. (*Id.* at 52).

The ALJ then inquired of Claimant's obesity, asking Claimant if he believed his weight affected his ability to stand and walk. (*Id.* at 52-53). Claimant testified that he did not believe his obesity had any effect on his ability to stand and walk but, rather, that his

back pain was responsible. (*Id.*). When asked whether he believed his weight had an effect on the pain in his lower back, Claimant stated "no." (*Id.* at 53). He testified that he also experienced pain in his right foot, which increased when he stood or walked, and which he characterized as being a contributing factor in his limitations in standing or walking. (*Id.*).

### iii.    Vocational Expert Testimony

At the September 14, 2023, administrative hearing, the ALJ employed a vocational expert, Asheley Wells, (the "VE") to aid in determining whether Claimant could perform his past relevant work or other work. (Tr. 21-64). The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified as follows:

> Possible past relevant work includes a mechanic, an auto mechanic. DOT code of a mechanic is 620.261-010; skilled; SVP 7; medium in exertion. I have what, Your Honor, looks like a composite position, and it's four positions . . . all in the coal-mining industry . . . . The first portion of this composite position is a roof bolter, and the . . . DOT code for the roof bolter: 930.683-026; semi-skilled; 4; medium in exertion. He also stated he was a general miner; DOT code 939.281-010; skilled; SVP 6; very heavy in exertion. As well as a rock truck driver; DOT code 920.683-010; unskilled; 2; medium in exertion. And the final portion of this composite job is a shuttle car operator. DOT code for the shuttle car operator: 932.683-022; semi-skilled; 4; medium in exertion, brining the entire composite position to skilled work, SVP 6, very heavy in exertion, and . . . according to the records that I read, he stated that he performed it all at the medium exertion level. And then finally, Your Honor, the last position stated was a tree trimmer. DOT code for the tree trimmer is 408.664-010; semi-skilled; 4; heavy in exertion, as listed and performed.

(Tr. 56-57).

The ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work at the light exertional level, with some additional limitations. (Tr. 57-58). Specifically, the hypothetical individual could (1) lift, push, pull, or carry twenty pounds occasionally and

ten pounds frequently; (2) sit for six hours; (3) stand and/or walk for two hours; (4) occasionally operate foot controls; (5) frequently operate hand controls; (6) frequently reach in all directions; (7) frequently handle, finger, and feel; (8) occasionally climb ramps and stairs; (9) never use ladders, ropes, or scaffolds; (10) never balance; (11) occasionally stoop; (12) never kneel, crouch, or crawl; (13) never work at unprotected heights; (14) never work around moving, mechanical parts or decision-making; (15) occasionally operate motor vehicles; (16) occasionally work in humid or wet weather; (17) occasionally work around pulmonary irritants; (18) never experience extreme cold or heat; (19) never work with vibration; (20) regularly be off task 5% of the time, beyond normal breaks; and (21) due to distractions of physical symptoms, never do high-production-rate or fast-paced work. (*Id.*). The VE testified that the hypothetical person would not have the capacity to perform any of Claimant's past employment. (Tr. 58). The ALJ then asked if there would be light work available to the hypothetical person in the economy, generally. (*Id.*). The VE opined that there were various sedentary, unskilled positions with a specific vocational preparation ("SVP") level of 2 that the hypothetical individual could perform, including an addressing clerk, a document preparer, and a weight tester. (Tr. 59). Lastly, the ALJ turned to the issue of an employer's tolerance for (1) time off task beyond normal breaks, and (2) monthly absences before full-time, competitive work would be excluded. (*Id.*). The VE testified that, based on her education, experience, and research, an employer would typically not tolerate off-task behavior "more than just 10% of the workday outside of the normal breaks" or absenteeism, "on a continual basis, . . . more than just one day per month." (Tr. 59-60).

### iv.    Consultative Evaluation

On December 5, 2022, Claimant presented to Nicole M. Smith, M.A., a licensed psychologist at ASPIRE Occupational Rehabilitation, for a consultative adult mental status examination. (Tr. 630-635). According to provider notes, Claimant's "[c]hronic pain was a prominent focus of clinical attention during the interview," and Claimant "reported significant distress in social, occupational, and other areas of functioning secondary to chronic pain." (Tr. 631). He reported "sadness, worry, and anxiety, and he appear[ed] frustrated with his inability to work and perform activities at the pre-injury/pre-illness level." (*Id.*). Based on her review of Claimant's medical records, as well as the impressions made during the evaluation, the provider diagnosed Claimant with (1) persistent, moderate somatic symptom disorder with predominant pain; (2) unspecified depressive disorder; and (3) unspecified anxiety disorder. (Tr. 633).

### v.    State-Agency Medical Consultants

Narendra Parikshak, M.D. and Palle Reddy, M.D., submitted medical opinions at the initial and reconsideration stages, respectively. (Tr. 67-70, 75-80). First, Dr. Parikshak opined that Claimant had the following severe impairments: (1) carpal tunnel syndrome; (2) diabetes mellitus; (3) sleep-related breathing disorders; and (4) other disorders of the gastrointestinal system. (Tr. 67). With respect to Claimant's RFC, Dr. Parikshak opined that Claimant was limited to lifting and/or carrying a maximum of fifty pounds occasionally, and twenty-five pounds frequently; standing and/or walking for a total of six hours in an eight-hour workday; and sitting for a total of approximately six hours in an eight-hour workday. (Tr. 68). Additionally, Dr. Parikshak opined that Claimant would have postural limitations, including only occasionally climbing ramps/stairs/scaffolds, and manipulative limitations in fine fingering manipulation in

both hands. *Id.* Dr. Parikshak also opined that Claimant would have environmental limitations related to extreme cold, extreme hot, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 69). Based on these opinions, Dr. Parikshak found that Claimant was not limited to unskilled work due to his impairments and that the maximum sustained work Claimant could sustain was medium. (Tr. 70). Ultimately, Dr. Parikshak determined that Claimant was not disabled. (*Id.*). On reconsideration, Dr. Reddy affirmed Dr. Parikshak's prior medical evaluation. (Tr. 75). In addition to those impairments Dr. Parikshak had listed as severe, Dr. Reddy opined that Claimant had the following non-severe impairments: (1) depressive, bipolar, and related disorders; (2) anxiety and obsessive-compulsive disorders; and (3) somatic symptom and related disorders. (Tr. 76).

With respect to Claimant's mental impairments, Dr. Jeff Boggess, Ph.D., opined at the reconsideration stage[2] that Claimant had no limitations in the functional ability to adapt or manage oneself but mild limitations in the functional abilities of understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. (Tr. 76). No mental limitations were included in the RFC recommendation.

### C.     Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential

---

[2]     The Disability Determination Explanation from the initial level contains no evaluation of Claimant's alleged mental impairments beyond a statement that no Mental Residual Functional Capacity findings were made associated with Claimant's claim. (Tr. 69).

evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive

presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite [his] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's

"pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ determined that Claimant had not engaged in substantial gainful activity since December 26, 2019, the alleged onset date of his disability. (Tr. 19). Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: obesity; bilateral carpal tunnel syndrome, status-post release surgery on the left; recurrent anal fistulas; and right foot nerve damage. (*Id.*). The ALJ further found that the following asserted impairments were "non-severe because they did not cause a significant limitation in the ability to perform basic work activities": obstructive sleep apnea; hypertension; hyperlipidemia; upper respiratory infection; GERD; hematochezia; vitamin D deficiency; acute sinusitis; hemorrhoids; restless leg syndrome; toe infection; type II diabetes mellitus with peripheral neuropathy; lumbar degenerative disc disease; osteoarthritis of the left knee; and fatty liver. (Tr. 19-20).

Turning to Claimant's mental-health impairment of depression and anxiety, the ALJ discussed each of the four areas of mental functioning as part of the special regulatory technique. As to the first three areas of mental functioning—(1) understanding, remembering, or applying information; (2) interacting with others; and (3) concentrating, persisting, or maintaining pace—the ALJ cited the opinions of Dr. Fuess and Dr. Boggess that Claimant "ha[d] a mild limitation." (Tr. 21-22). As to the fourth area of mental functioning—adapting or managing oneself—the ALJ found no limitation. (*Id.*). Based upon these findings, the ALJ determined that Claimant had "no chronic mental health medically determinable impairment" or "significant work-related dysfunction." (Tr. 22).

Next, the ALJ found that, since December 26, 2019, none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 22). Upon assessing Claimant's RFC, the ALJ determined the following:

> [T]he claimant has the residual functional capacity to lift, carry, push, and/or pull up to 20 pounds occasionally and 10 pounds frequently; he can sit for 6 hours total during an 8-hour workday and stand and/or walk 2 hours total during an 8-hour workday, with alternating from sit to stand or walk for 2-3 minutes every hour and from stand or walk to sit for 2-3 minutes each 1/2 hour, always with the capacity to remain on task during position changes, some covered by typical work breaks or time off task there beyond. He can never operate foot controls on the right and can occasionally operate foot controls on the left; he can frequently operate hand controls; he can frequently handle, finger, feel, and reach in all directions. He can never balance (navigate uneven or slippery terrain), kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; he can occasionally stoop or climb ramps and stairs. He must avoid all exposure to extreme cold, extreme heat, vibration, and workplace hazards such as unprotected heights and proximity to moving mechanical parts of dangerous machinery; he can tolerate occasional exposure to weather, humidity, wetness, pulmonary irritants, and operating a motor vehicle. Due to distractions of physical symptoms, he can perform no high production rate of fast-paced work. Beyond normal breaks, he would be off task five percent of the time during the workday.

(Tr. 22-23). Notably, the ALJ did not include any mental-health limitations in the Claimant's RFC. *See id.*

The ALJ concluded that Claimant was "limited to essentially sedentary exertion with additional restrictions," rendering Claimant "unable to perform past relevant work as actually or generally performed." (Tr. 27). He noted that Claimant was "a younger individual" with "a limited education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (Tr. 28). Because the ALJ determined that Claimant was unable to perform the full range of sedentary work, he enlisted a VE to aid in his finding that Claimant is capable of working as a addressing clerk, a document preparer, or a weight tester. (Tr. 28). As a result, the ALJ concluded that Claimant was not disabled, and the claim for benefits was denied.

## II.     LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Claimant argues two grounds for reversal, namely, that the ALJ (1) inadequately developed the medical evidence in this case; and (2) failed to consider and properly evaluate the claim under the combination of impairments theory. (ECF No. 6 at 15-18). He asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 18). The Commissioner responds that the ALJ complied with his duty to develop the record in this

case and properly accounted for the combined effects of his impairments.  (ECF No. 10 at 12-20).

### A.    Duty to Develop Record

Claimant contends that the ALJ failed to fully develop the record in this case by failing to "fully develop the RFC of his treating doctor on his physical limitations," specifically as relates to his need for frequent restroom breaks and use of a cane.  (ECF No. 6 at 15-17).

"[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the claimant when that evidence is inadequate."  *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *Thompson v. Colvin*, No. 3:14-cv-15949, 2015 WL 13746683, at *13 (S.D.W. Va. June 30, 2015) ("[A]n ALJ has the duty to fully and fairly develop the record."), *adopted by* 2015 WL 5626513 (S.D.W. Va. Sept. 24, 2015).  However, the ALJ "is not required to act as Claimant's counsel" and may "presume that Claimant's counsel presented Claimant's strongest case for benefits."  *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011).  In other words, "[C]laimant, through counsel, [may not] rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation."  *Id.* (quoting *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008)).  To that end, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Id.* at *16 (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)); *see Craft v. Apfel*, 164 F.3d 624 (4th Cir. 1998) (table), 1998 WL 702296, at *3 (noting that the administrative record must contain "sufficient medical evidence . . . to make an informed decision about [the claimant's] impairments");

*Laney v. Astrue*, No. 3:09-cv-00780, 2011 WL 11889, at *11 (S.D.W. Va. Jan. 4, 2011) (stating that ALJ's duty to develop record is "to insure that the record contain[s] sufficient evidence upon which he could make an informed decision" (citing *Ingraham v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007))).

Here, there is simply no indication here that the ALJ failed to fully develop the record in deciding Claimant's claim.   The Residual Physical Functional Capacity Evaluation completed by Rachel Baisden on September 5, 2023—which Claimant contends the ALJ failed to adequately consider—was completed approximately one week prior to the ALJ hearing and contains a handwritten notation that the RFC conclusions therein were "a guess." (Tr. 895). Regardless of any issues with that evaluation, the ALJ did consider it in reaching his decision. In fact, the ALJ dedicated an entire paragraph in his determination to discussing it. (Tr. 27). As such, the undersigned **FINDS** that the ALJ adequately developed the record.

### B.    Combined Effects of Impairments

Claimant also argues that the ALJ did not account for the combined effects of his "multiple severe medical/mental problems."  (ECF No. 6 at 18).

As part of the RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite [his] limitations" in light of "'all' relevant record evidence." *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520(e)).  In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, No. 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)).  "The ailments should not be fractionalized and considered in

isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities."  *Id.* (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)).

Here, in conducting his RFC assessment, the ALJ summarized the medical evidence of record relating to Claimant's impairments, both medical and mental.  (Tr. at 19-27).  The ALJ discussed Claimant's impairments, both severe and non-severe, in detail throughout his decision. In making his final determination, the ALJ relied upon Claimant's medical records, as well as the testimony of Drs. Ostrow and Fuess, who "both testified that none of the claimant's impairments, ***either singly or in combination***, medically meet or equal any of the listed impairments" contained in the applicable regulations. (Tr. 22). The ALJ also noted several times in his decision that he considered all of Claimant's impairments individually and in combination in concluding that Claimant was not disabled. *See, e.g.,* (Tr. 22 ("I . . . find that the claimant does not have any impairment or combination of impairments that meets or medically equals one of the listed impairments"); Tr. 24 ("All work-related physical and mental limitations are considered, whether due to a person's obesity, other impairment(s), or combination of impairments.")). In sum, the ALJ's written decision indicates that he considered the combined effects of Claimant's impairments on his ability to work.

Claimant further contends that "[e]ven a cursory review of the evidence of record would conclude that the medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments" necessary for a disability determination under applicable guidelines. (ECF No. 6 at 18). But Claimant fails to illustrate *how* the diagnoses outlined in his medical records support his conclusion. "[A] diagnosis is insufficient to prove disability—rather, there must be resultant functional

limitations precluding a claimant's ability to work." *Smith v. Berryhill*, No. 3:16-cv-11868, 2018 WL 3800039, at *9 (S.D.W. Va. July 17, 2018) (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)), *adopted by* 2018 WL 3795277 (S.D.W. Va. Aug. 9, 2018). Claimant bears the burden to demonstrate that the RFC assessment does not accurately reflect the restrictions he requires. *See Okes v. Berryhill*, No. 1:16-cv-08976, 2017 WL 4003028, at *5 (S.D.W. Va. Aug. 11, 2017), *adopted by* 2017 WL 3996419 (S.D.W. Va. Sept. 11, 2017). He has not met that burden here. As such, the undersigned **FINDS** that the ALJ's RFC assessment accounts for the combined effects of Claimant's impairments.

Ultimately, Claimant asks this Court to do exactly what the law forbids: reweigh the evidence and substitute the Court's judgment for that of the ALJ. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *Monsour*, 806 F.2d at 1190. As noted above, the Court may review the administrative record to determine whether the Commissioner—through the ALJ—applied the correct legal standards and supported his findings with substantial evidence. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citation omitted). "To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." *Id*. at 95 (quotations and citation omitted); *see also* 20 C.F.R. § 404.1545(a)(3) (to determine an individual's residual functional capacity, an adjudicator must base his assessment on "all of the relevant medical and other evidence"). If substantial evidence supports the Commissioner's decision, the court must affirm it, 42 U.S.C. § 405(g), even if the reviewing court would have decided the case differently. *Monsour*, 806 F.2d at 1190-91.

Because substantial evidence (or more than a mere scintilla) supports the ALJ's assessment of the evidence, and the record contained ample evidence from which the ALJ could render his determination, the undersigned **FINDS** the ALJ's decision is supported

by substantial evidence, and Claimant fails to demonstrate reversible error. Accordingly, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:    August 13, 2025

Dwane L. Tinsley
United States Magistrate Judge